**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH M.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23 C 0088** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, over three years ago in May of 2020. (Administrative Record (R.) 225-26). He claimed that he had been disabled since November 1, 2018 (R. 225) due to PTSD, right shoulder surgeries, right knee surgeries, diabetes, restless leg syndrome, and acid reflux. (R. 266). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 6, 2023, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on January 24, 2023. [Dkt. ##9, 11]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "status post right knee meniscal repair; status post right shoulder rotator cuff repair; diabetes mellitus; lumbar degenerative disc disease; depression; post-traumatic stress disorder and anxiety." (R. 18). The ALJ said the plaintiff's gastrointestinal reflux disease was not a severe impairment. (R. 18). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ focused on listings 1.15 (lumbar degenerative disc disease), 1.18 (status post right knee meniscal repair; status post right shoulder rotator cuff repair); 9.00 (diabetes/endocrine disorders); 12.04, 12.06, and 12.15 (mental impairments). (R. 18-19). The ALJ found that the plaintiff had mild limitations in understanding, remembering or applying information; concentrating, persisting or maintaining pace; and adapting or managing oneself; and a marked limitation in interacting with others. (R. 19-20).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform light work with some additional limitations:

> the [plaintiff] was only able to frequently reach in all directions, including overhead bilaterally. The [plaintiff] could frequently balance, stoop, kneel, crouch, crawl and climb ramps and stairs but only occasionally climb ladders, ropes or scaffolds. The [plaintiff] was able to perform simple, routine tasks; make and perform simple work-related decisions; occasionally interact with coworkers and supervisors and never interact with the public.

2

(R. 21). The ALJ then summarized the plaintiff's allegations regarding his limitations from his impairments, noting that he had reported his medical conditions affected his ability to lift, squat, bend, stand, reach, use his hands, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, follow instructions, and get along with others. He claimed he could not lift anything over 20 pounds, and could only walk 2 blocks before he needed to stop and rest for 20 minutes before he could resume walking. (R. 22).

At his administrative hearing, the plaintiff said he could not get along with people and could not deal with them; he preferred being alone. He felt that people "acted stupid" and were "ignorant." He could not go shopping because he was "worried about what people may do." Being around people made him angry. He tried talking with social workers, but none of them were "good enough." He did not participate in group therapy because he "didn't need to fix others." (R. 22-23). Physically, the plaintiff testified that because of the "wear and tear" to his body from serving in the Army, he could not lift anything over 5 pounds and could only walk, sit for 5 to 8 minutes or stand for "about 10 minutes." He had to change positions, move, stretch, and bend. He didn't take any prescription pain medications for his physical problems aside from medical marijuana. (R. 23). The ALJ then determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 23).

The ALJ then reviewed the medical evidence. He noted that the plaintiff was a combat veteran with history of post-traumatic stress disorder with psychiatric hospitalizations in 2009 and

3

2014, well prior to his alleged onset date of November 2018. (R. 230). He also noted that the record documented chronic shoulder and knee pain with a history of right knee arthroscopic surgery and meniscal repair and right shoulder rotator cuff repair, as well as elevated blood sugars, low back and shoulder pain, anxiety, poor sleep, night terrors, and anxiety related tremors. However, the ALJ also noted that the plaintiff routinely presented as in no acute distress, and exams revealed only intermittent abnormalities with generally preserved musculoskeletal, neurologic and psychiatric functioning. Physical exams did note tightness, tenderness, and some pain, but overall musculoskeletal examinations documented grossly intact sensation, intact cranial nerves, full upper and lower extremity motor strength, intact reflexes and sensation, normal coordination, and normal gait. (R. 24-25). Consultative examination showed full range of motion of the shoulders, elbows, wrists, hips, knees, ankles, cervical, and lumbar spine. Straight leg raise test was negative bilaterally both seated and supine, and there was full 5/5 strength in upper and lower extremities and intact reflexes and sensation without any abnormality in gait or coordination. (R. 25).

Mental status exams revealed either an anxious mood and irritable affect or a euthymic or irritable mood. But findings were otherwise grossly unremarkable documenting a logical thought process, normal speech, no signs of psychomotor agitation, full orientation, an open body posture, good eye contact, and intact memory, attention, concentration, and fund of knowledge and comprehension. (R. 25). Psychological consultative exam reported plaintiff as "calm," "placid," and "quite calm and cooperative during the examination," with "adequate energy" and "ambulating independently but was somewhat tremorous." Plaintiff's thought process was logical, and he was able to recall six digits forward and four digits in reverse; displayed adequate short and long- term

4

memory, and computational skills. Plaintiff's thinking processes were intact, and his judgement, insight, and thought processes characterized by average speed, intact coherence and adequate flexibility. Plaintiff was also noted to display a "ruminative ideation of a highly constricted set of thoughts," including "a social phobia of mild to moderate intensity concerning crowds" without "a history of avoidance." (R. 25).

Turning to objective testing, the ALJ related that a September 6, 2018, right knee x-ray showed no evidence of acute fracture or dislocation, and an October 11, 2018 left knee x-ray showed mild degenerative changes without evidence of fracture, dislocation or, supra-patella joint effusion. A right shoulder MRI dated October 21, 2018 showed postsurgical changes without definite full thickness retear of the rotator cuff tendons, and a lumbar x-ray from June 22, 2019 was grossly unremarkable showing "no etiology for back pain" and "no substantial degenerative change," well-maintained vertebral body heights and intervertebral disc spaces; normal soft tissues without evidence of fracture, subluxation, osteolytic or osteoblastic lesions." Electromyography with nerve conduction study of the bilateral upper extremities performed on March 4, 2020 suggested mild carpal tunnel syndrome on both sides with normal radial and ulnar nerves on both sides. (R. 26).

Plaintiff's course of treatment was generally conservative, follow-ups were intermittent, and plaintiff generally declined medication except for medical marijuana. The ALJ felt that the plaintiff engaged in a level of activity that was inconsistent with his allegations of extreme functional physical and limitations. The medical evidence of record documented that the plaintiff was actively "looking for work" in office positions and pursuing job leads, and felt he "c[ould] work" but believed he was not being hired due to his medical cannabis use. (R. 26). The ALJ felt

5

that the divergence between the plaintiff's hearing allegations and reports of functional limitations and the underlying objective evidence of record longitudinally demonstrating generally clinically preserved musculoskeletal, neurologic, and psychiatric functioning as well as stable diagnostic evidence suggested he underreported the effectiveness of his treatment, overemphasized his degree of pain or was simply not as limited as he claimed. (R. 27). The ALJ explained that "[w]hile the evidence establishes some limitations, overall he would still have been capable of performing the residual functional capacity assessed herein on a substantial basis with the additional limitations as established by the record." The ALJ said the plaintiff's "testimony and the preponderance of the evidence, including stable objective findings, clinical abnormalities on examinations and conservative treatment recommendations without evidence of anticipation of operative measures do not support additional restrictions in the residual functional capacity as stated herein." (R. 28).

The ALJ then moved on to the medical opinions in the record. First, there were the opinions from the state agency psychologists. After reviewing the evidence, they felt that the plaintiff retained the mental capacity to understand, remember and concentrate sufficiently in order to carry out one- or two-step instructions for a normal work period; make simple work-related decisions; interact with others sufficiently in a work setting with reduced social demand; doing best in a predictable, routine work setting where employment related social interactions are infrequent, brief and largely task-specific. The ALJ thought their opinions were persuasive as they were consistent with the plaintiff's mental status examinations demonstrating intact cognitive functioning with abnormalities in mood and affect, but also criticized them for using "vague and vocational terms," such as "one or two-step instructions" or "three to four step tasks," and for failing to adequately define terms such as "low stress demands" and "brief and superficial" interactions or demands. (R.

6

29).

Next, there were the opinions from the state agency reviewing physicians, who opined that plaintiff would be able to perform light work, and was limited to frequent climbing, kneeling, crouching and crawling, and frequent reaching in all directions with the right upper extremity. The ALJ found these opinions somewhat persuasive as they were generally consistent with the underlying available medical evidence of record at the time and consistent with subsequently developed evidence including clinical examinations showing generally preserved musculoskeletal and neurologic functioning, an overall conservative course of medical treatment without the need for long-term aggressive operative measures. But, that ALJ felt that, viewing the evidence in a light most favorable to the plaintiff, additional postural and manipulative limitations were warranted. (R. 29).

Finally, the ALJ noted that psychologist, Eugena Griffin, opined that the plaintiff had a trauma-related disorder that did not meet or equal a listing and resulted in no limitations in the four functional areas of the "B" criteria, but did restrict him to work in a structured environment that does not require standing for long periods of time. The ALJ did not find this opinion persuasive because it was not consistent with the opinions of the state agency psychological reviewers and not was not supported by the preponderance of the medical evidence. (R. 29).

Next, relying on the testimony of the vocational expert, the ALJ determined that the plaintiff was unable to perform his past work as a computer aided design (CAD) technician; a personnel clerk, or a mail clerk/carrier. (R. 30). But, again relying on the testimony of the vocational expert, the ALJ further determined that there were other jobs in the national economy that plaintiff could perform. These included cleaner housekeeping (DOT 323.687-014;

approximately 234,000 jobs nationally); marker (DOT 209.587-034, approximately 147,000 jobs nationally); and photocopy machine operator (DOT 207.685-014; approximately 14,000 jobs nationally). (R. 31). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 32).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court

reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor‑Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build the required "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[1] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2] As it happens,

---

[1] By way of example, in the Seventh Circuit's ruling in *Jarnutowski*, 48 F.4th 769, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she had. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it

10

there is a "logical bridge" problem in this case.

## III.

## A.

In asking for a remand of this case, the plaintiff principally argues that the ALJ's assessment of his social functioning is lacking a "logical bridge" from evidence to conclusion. After reviewing the medical record, the medical opinions, and the plaintiff's allegations, the ALJ determined that the plaintiff had a marked limitation in interacting with others. That's not the plaintiff's claim, that's the ALJ's conclusion, so there can be no dispute about the level of functioning – or limitation thereof – we are talking about. The Commissioner's regulations say that a marked limitation means a plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 12.00F(2)(d). As for interacting with others, the regulations explain that:

> This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require

---

sends the signal that ALJs should write more in each case (and thus hear fewer cases). The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

documentation of all of the examples.

12.00E(2). Accordingly, the ALJ determined that the plaintiff was *seriously* limited in his abilities to, generally, relate to and work with coworkers and supervisors, not to mention dealing with the general public. That's a big deal – or at least, it seems like it would be – given that the Commissioner's own ruling, SSR 85-15, explains that:

> The *basic mental demands* of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; *to respond appropriately to supervision, coworkers*, and usual work situations; and to deal with changes in a routine work setting. A *substantial loss of ability* to meet *any* of these basic work-related activities *would severely limit the potential occupational base.* This, in turn, *would justify a finding of disability* because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15, 1985 WL 56857, at *4 (emphasis added). On the one hand, a serious limitation – that's what the ALJ said the plaintiff had – would seem to equate to a substantial loss of ability which, according to SSR 85-15, would also seem to justify a finding of disability. We seem to say "seem" a lot because, on the other hand, it doesn't seem like a marked limitation in one area of functioning should automatically result in a finding of disability because the Listings of Impairments require a marked limitation in two areas of functioning for a finding of disability. *McCavitt v. Kijakazi*, 6 F.4th 692, 693 (7th Cir. 2021); *Lanigan v. Berryhill*, 865 F.3d 558, 562 (7th Cir. 2017). Even so, given SSR 85-15 a marked or serious limitation would seem to require quite a bit of accommodation.

In any event, the ALJ said he based his marked limitation finding on a number of factors culled from the record. (R. 20). He noted that, prior to and during the hearing, the plaintiff reported problems getting along with others, including family, friends, neighbors and, perhaps more significantly in the work context, authority figures. Even worse, the ALJ noted that the plaintiff

had been fired from a job because of problems getting along with other people. The ALJ further noted that the plaintiff said he didn't communicate with friends, was "verbally abusive", and had "trust issues." He avoided crowded places and preferred to be alone. The ALJ added that the psychological consultative examiner described the plaintiff as displaying a "ruminative ideation of a highly constricted set of thoughts," including "a social phobia of mild to moderate intensity concerning crowds" without a history of avoidance. Finally, the ALJ pointed to treatment records that showed the plaintiff did not engage in appropriate social interaction with medical providers and staff. (R. 20).

From there, the ALJ had to come up with an RFC – and a hypothetical for the vocational expert – that accounted for "all of [the plaintiff's] limitations supported by the medical record." *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022); *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). The Commissioner's own rulings – specifically SSR 96-8p – require ALJs to describe "how the evidence supports each conclusion . . . citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Jarnutowski*, 48 F.4th at 774. An ALJ's failure to comply with SSR 96-8p's requirements is a sufficient basis, by itself, to reverse an ALJ's decision. *Jarnutowski*, 48 F.4th at 774; *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96–8p, however, the ALJ did not explain how he arrived at these conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision."); *Jeske v. Saul*, 955 F.3d 583, 596 (7th Cir. 2020) (explaining that although an ALJ's failure to comply with SSR 96-8p "does not necessarily require remand," we must be satisfied that an ALJ considered SSR 96-8p's requirements and produced a decision supported by substantial evidence). The general idea that the Seventh Circuit has about this is that

a court can affirm an ALJ's decision if it is satisfied that the ALJ "buil[t] an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (quotation omitted). "Essentially, an ALJ's RFC analysis 'must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations.'" *Jarnutowski*, 48 F.4th at 774 (quoting *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

The ALJ's explanation of his final step from evidence to marked limitation to his RFC finding was this:

> To account for marked limitation in his ability to interact with others, I find that the claimant was able to perform simple, routine tasks; make and perform simple work-related decisions and occasionally interact with coworkers and supervisors and never interact with the public.

(R. 28). Depending on one's perspective, that could be described as "cryptic", "terse", or at best, "succinct." But, it cannot be described as "enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Jarnutowski*, 48 F.4th at 774.

First off, how does the part about "simple, routine tasks"; or "simple work-related decisions" account for a seriously limited ability to interact with others? The ALJ doesn't explain it. Neither, for that matter, does the Commissioner's brief, although that would be flirting with a violation of *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). *See Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022)("We must 'confine our review to the reasons supplied by the ALJ,' rather than allowing the government to invent new findings to rescue an insufficient decision on appeal."); *Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021)("Chenery generally confines a reviewing court to the agency's actual rationale for its decision, not an after-the-fact justification."). It's possible the limitation could be tied to serious social interaction issues given that plaintiff would

14

deal poorly with instruction or supervision that went beyond explanations of simple tasks. But that's only a guess and, given the requirement that the ALJ build an adequate "logical bridge" from the evidence to his conclusions, a guess isn't good enough.

The heart of that matter, though, is the restriction to "occasional[] interact[ion] with coworkers and supervisors." "Occasional" means up to a third – although no more than two hours – of every eight-hour day. *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). That seems like a lot for someone the ALJ calls *seriously* limited. It seems like a lot for someone the ALJ highlighted as being fired from a job for interaction issues; as verbally abusive; as having trouble getting along with family and friends, let alone authority figures like supervisors; as exhibiting "ruminative ideation of a highly constricted set of thoughts." (R. 20). We can see how one can get from point A– all those serious issues the ALJ pointed out – to point B– a marked limitation in social function. Where there needs to be an explanation is how we get from that marked limitation to interaction for up to two hours every day. But, there isn't one. *See Nichole S. v. Kijakazi*, No. 3:20-CV-50323, 2022 WL 614930, at *4-5 (N.D. Ill. Mar. 2, 2022)("Despite finding Plaintiff's functioning seriously limited, the ALJ determined that Plaintiff retained the ability to occasionally interact with coworkers . . . Although a marked limitation in an area of mental functioning may not necessarily be disabling, the ALJ must properly account for such limitations in the RFC. . . . The ALJ's decision is . . . devoid of any explanation as to how the restrictions he included specifically accommodated Plaintiff's marked impairments in interacting with others."); *Michael F. v. Comm'r of Soc. Sec.*, No. 419CV04062SLDJEH, 2020 WL 4275845, at *6 (C.D. Ill. July 2, 2020)("The Court cannot see how the ALJ went from the plethora of evidence supportive of [plaintiff's] serious limitation in

social interaction to the conclusion he remained capable of interacting with others in a work setting up to 1/3 of the workday.").

The Commissioner's memorandum does try to provide one. It says the ALJ's "limitation to occasional interaction with coworkers and supervisors and no interaction with the public echoes Dr. Mehr's suggestion that plaintiff was limited to 'reduced interpersonal contact away from the general public.'" [Dkt. #20, at 5]. But what Dr. Mehr actually said was that plaintiff was:

> [m]oderately limited in interacting with the general public. (R. 82). Limited social tolerance but can relate appropriately in socially undemanding settings that have low-stress demands and *require only brief superficial interactions* and with reduced interpersonal contact aw[a]y from the general public in a setting where social contact is incidental to the work performed.

(R. 82). With due respect to the Commissioner's attorney, we don't think it's reasonable to replace "only brief superficial interaction" with "occasional" -- meaning up to two hours a day of social interaction, especially when that interaction is not limited, as the plaintiff points out, in any qualitative fashion. "Brief" has to do with duration – and, again, it's not clear without more from the ALJ how "brief" amounts to up to two hours every day– but "superficial" has nothing to do with duration. Obviously, the "superficial" aspect has to do with what kind of interaction the worker is having with co-workers and supervisors. The ALJ's RFC, and the Commissioner's memorandum [Dkt. #20, at 5-6], fail to acknowledge that in any way.[3]

---

[3] The Commissioner's memorandum also claims that the ALJ rightly rejected the reviewing physician's language because it was "colloquial" and not "precise." [Dkt. #20, at 5]. But that argument is undermined by ALJs' routine use of "brief" and/or "superficial" in RFCs and hypotheticals, and the fact that they also routinely distinguish those limitations from "occasional." *See, e.g.*, *Reggie N. v. Kijakazi*, No. 21 CV 63, 2023 WL 5277877, at *4 (N.D. Ill. Aug. 16, 2023); *Latanza B. v. Comm'r of Soc. Sec.*, No. 22 C 6353, 2023 WL 3886110, at *1 (N.D. Ill. June 8, 2023); *Berlinda G. v. Kijakazi*, No. 22 C 4196, 2023 WL 3847107, at *1 (N.D. Ill. June 6, 2023); *Lorena T. v. Kijakazi*, No. 21 C 6175, 2023 WL 3123277, at *1 (N.D. Ill. Apr. 27, 2023); *Amanda C. v. Kijakazi*, No. 421CV00196KMBSEB, 2023 WL 2673916, at *2 (S.D. Ind. Mar. 29, 2023); *Jennifer R. v. Kijakazi*, No. 20-CV-50184, 2023 WL 2631726, at *1 (N.D. Ill. Mar. 24, 2023); *Lemuel W. v. Kijakazi*, No. 22-CV-4448, 2023 WL 2333249, at *2 (N.D. Ill. Mar. 2, 2023); *Donald C. v.*

Moreover, *Chenery* or no, it's difficult to accept the Commissioner's brief's link from Dr. Mehr's opinion to what the ALJ was thinking.   The ALJ said it was persuasive to the extent it was "consistent with the claimant's mental status examinations demonstrating intact cognitive functioning with abnormalities in mood and affect."  (R. 29).   So, how much of Dr. Mehr's opinion did the ALJ think was acceptable and how much wasn't?   It would seem that the "intact cognitive functioning" would have more to do with the "simple, routine tasks" part of the ALJ's RFC than the "occasional" interaction part.   Does that mean that the parts of Dr. Mehr's opinion that are consistent with the evidence regarding "abnormalities in mood and affect" – we don't know which parts those are of course – are somehow tied to the social interaction part?   It seems much more likely that the ALJ's RFC finding had little or nothing to do with Dr. Mehr's opinion. Indeed, the ALJ thought a lot of that opinion was "vague."   (R. 29).

It's no easy task to write decision after decision – hundreds a year – in the hopes of perhaps satisfying one of many judicial officers at the district court level and perhaps even two or three at the appellate court level after that.   The ALJ here didn't care for terms that were "vague."   Well, we're fairly certain ALJs find the application of the "logical bridge" requirement pretty vague.   It is, as we have said, entirely subjective.   And, it is applied on the proverbial "case-by-case" basis. *Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023).   So, if one is looking for predictability or precision, one has probably come to the wrong place.

Yet, in this instance, at least, we don't think it is asking too much of the ALJ to take us from point A to point B to point C.   It's not self-evident that the limitation to "simple, routine

*Kijakazi*, No. 122CV00890TABTWP, 2023 WL 179628, at *1 (S.D. Ind. Jan. 13, 2023); *Nadira F. v. Kijakazi*, No. 21-CV-4464, 2022 WL17534068, at *1 (N.D. Ill. Dec. 8, 2022); *Throw v. Kijakazi*, No. 3:21-CV-170-JPK, 2022 WL 4592022, at *13 (N.D. Ind. Sept. 30, 2022).

tasks," "simple work-related decisions", and "occasional[] interact[ion] with coworkers and supervisors" accounts for a *marked* limitation in interacting with others. And, we are not alone in having a problem with the kind of analysis the ALJ provided here. *See, e.g., Nichole S. v. Kijakazi*, No. 3:20-CV-50323, 2022 WL 614930, at *5 (N.D. Ill. Mar. 2, 2022)("The Court cannot reconcile the ALJ's failure to adopt an RFC with limitations at least as restrictive as the ones outlined by the state agency psychologists. The ALJ's decision is also devoid of any explanation as to how the restrictions he included specifically accommodated Plaintiff's marked impairments in interacting with others. For these reasons, ALJ has failed to provide an accurate and logical bridge from the evidence to his conclusion as to Plaintiff's RFC."); *Michael F. v. Comm'r of Soc. Sec.*, No. 419CV04062SLDJEH, 2020 WL 4275845, at *5 (C.D. Ill. July 2, 2020)(". . . at first glance, the ALJ's finding that Michael could have "occasional" interaction with supervisors, coworkers, and the public does not follow from the ALJ's finding that Michael had "marked" limitation in the functional area of interacting with others. Upon closer consideration of the entirety of the ALJ's Decision, the Court remains unable to trace the path of the ALJ's reasoning."); *Bronnson v. Astrue*, No. 10-C-0856, 2012 WL 3686221, at *9 (E.D. Wis. Aug. 24, 2012)("The ALJ cited and accepted the conclusions of the psychiatric review of Dr. Keith Bauer, the state agency doctor, finding moderate limitations in numerous categories such as the ability to maintain attention and perform with regular attendance or at a consistent pace, and a marked limitation in the ability to interact appropriately with the general public. However, restricting the hypothetical to simple, routine tasks and only occasional interaction with the public does not adequately account for the mental impairments discussed by Dr. Bauer, particularly where there is no indication that Porter had reviewed the medical record."). Accordingly, this case must be remanded to give the

18

ALJ an opportunity to build a better "logical bridge."

## B.

Of course, this not to say that the ALJ's ultimate conclusion that plaintiff is not disabled was wrong. As the Seventh Circuit explained when first enunciating the "logical bridge" requirement, even if there is ample evidence to support an ALJ's ultimate decision, even if the reviewing court agrees with that decision, the reviewing court cannot uphold that decision without an adequate "logical bridge." *Sarchet*, 78 F.3d at 307. With that in mind, it is perhaps worthwhile to briefly address plaintiff's other argument for remand. The plaintiff contends that the ALJ's evaluation of his testimony regarding his symptoms was flawed in a few different respects. First, the plaintiff complains that the ALJ violated SSR 16-3p by making a character judgment against him. More specifically, the plaintiff argues that the ALJ was not allowed to suggest he "was deceitful" insofar as he collected unemployment benefits the first two months he claims he was unable to work. [Dkt. #16, at 11-12].

It's true, as the plaintiff argues, that ALJs aren't supposed to "assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2016 WL 1119029, *11. But, "obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). In this instance, the ALJ noted that while the plaintiff claims he became unable to work in November or 2018, he applied for and collected unemployment benefits in the first two quarters of 2019. As the ALJ explained, "a claim for and continuing receipt of unemployment insurance benefits for which an individual must hold themselves out as ready, willing, and able to accept

employment if available, is inconsistent with a claim for Social Security disability benefits for which an individual must hold themselves out as being unable to perform any substantial gainful activity." (R. 18). SSR 16-3p does not preclude an ALJ from considering inconsistent statements like these. In fact, it specifically calls for it, *see* SSR 16-3p, 2016 WL 1119029, *8 (". . . we will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances."), as do the regulations. *See Grotts*, 27 F.4th at 1278; 20 CFR §§ 404.1529(c)(4), 416.929(c)(4). The plaintiff is confusing a very logical reaction to him saying he is disabled to get one type of benefit and at the same time saying he is able to work to get another type of benefit with a "character judgment." There may, as plaintiff seems to concede, a question of character there, but that's not where the ALJ went. There is a difference between saying "plaintiff lied about being disabled because he is a liar" and saying "plaintiff lied about being disabled because he also said he was able to work." The ALJ did the latter. *See, e.g, John B. v. Kijakazi*, No. 20-CV-50137, 2023 WL 4762602, at *7 (N.D. Ill. July 26, 2023)("While the ALJ's assessment based on his work history may appear to cast aspersions on his character, interpreting SSR 16-3p as prohibiting any analysis which implies a claimant was less than forthright in alleging disabling symptoms would effectively compel ALJs to accept all symptom allegations. As the ALJ rooted her suggestion in her analysis of Plaintiff's work history, the Court does not find that this paragraph crossed the line into an impermissible character assessment.").

The plaintiff also takes the ALJ to task for considering his aversion to taking prescribed mental impairment medications like Zoloft, Paxil, Wellbutrin, Effexor, Remeron, Cymbalta, Viibryd, Trazodone, and Seroquel. [Dkt. #16, at 12-13]. The plaintiff argues in his brief that he

felt the medications were a waste of time and that he preferred to use marijuana instead. [Dkt. #16, at 12]. The ALJ discussed the plaintiff's preference for marijuana at some length, and certainly did not ignore that it was the plaintiff's preferred medication and that he felt it worked better than the medications he had been prescribed. (R. 23, 26-27). So, the ALJ didn't ignore that plaintiff's explanation.

The plaintiff goes on to suggest that mental impairments "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). Possibly, but that doesn't seem to have been the case here; at least, plaintiff does not direct us to any evidence that it was. A plaintiff can't simply make claims about symptoms; they have to support their claims with medical evidence. 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); *Grotts*, 27 F.4th at 1278 ("Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."); *Karr*, 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled). Here, the evidence is that plaintiff went to counseling sessions and tried medications, but there is no mention by any mental healthcare provider that his mental impairment was affecting his choice of treatment. At least, the plaintiff does not direct the court to any such evidence. Instead, the mental healthcare providers note his preference for marijuana and caution against its use, and plaintiff makes his own choice. (R. 381, 382, 579, 842, 867). The plaintiff gives absolutely no indication that he is so impaired that he doesn't understand the need for medication. Instead, he repeatedly explains that he *is* using medication, that it's marijuana, and that he feels it works better.

Given the record, it's difficult to see what the plaintiff wanted from the ALJ, other than to speculate in his behalf that his illness was causing him to eschew medication in favor of marijuana. That sounds a lot like the plaintiff wanted the ALJ to "play doctor", which is ironic as plaintiffs repeatedly accuse ALJs of doing just that and argue it necessitates a remand. *See, e.g., Brian W. v. Kijakazi*, No. 22 C 4802, 2023 WL 3568669, at *5 (N.D. Ill. May 18, 2023); *Destinay O. v. Kijakazi*, No. 22 C 798, 2023 WL 2683499, at *3 (N.D. Ill. Mar. 29, 2023); *Marcine H. v. Kijakazi*, No. 22 C 730, 2023 WL 2631624, at *4 (N.D. Ill. Mar. 24, 2023).

The plaintiff even cites some articles about veterans refusing medication because of the stigma or dependency. [Dkt. # 16, at 12 n.5]. But, again, that's speculation when it comes to the specific case we have here; maybe it applies and maybe it doesn't. Given plaintiff's own statements, it doesn't seem to apply here. After all, he used marijuana regularly and seemingly without fear of becoming dependent on that. And, time and time again plaintiff told mental healthcare providers that there was a stigma about his *marijuana use* but he persisted in using it nevertheless. He told the ALJ that someone made fun of him using marijuana at a therapy session; he made no mention of anything similarly stigmatizing happening as a result of his taking medication. (R. 57). Indeed, he even would not give it up in order to get a job that might require a drug screen. (R. 586, 587, 590, 592, 615). So, the plaintiff takes one speculative stance in his brief – "maybe I don't take medication because there's a stigma about it" – and another stance throughout the record – "I'm going to continue using marijuana as medication despite the stigma."

In this contest, it has to be said that, plaintiff has been represented by counsel since at least as far back as July 2019. (R. 106-07). That was two and a half years before the administrative hearing. Perhaps plaintiff's counsel discussed the plaintiff's aversion to psychotropic medication

with the plaintiff at some point over that lengthy period, perhaps not. But he did not question plaintiff about it at the administrative hearing. (R. 63-65). And, he didn't mention anything about it in the brief he submitted to the Appeals Counsel to support the plaintiff's request for review of the ALJ's decision. Indeed, he didn't even mention any issues with the ALJ's credibility finding whatsoever. (R. 220-22).

If an issue is important enough to raise in federal district court, it ought to be raised in the administrative process. Frankly, reviewing courts have seen this type of thing far too often and for far too long. Indeed, a few years ago, then-Magistrate Judge, now-District Court Judge Iain Johnston expressed the frustration of many reviewing courts with this tactic:

> A final note. One unfortunate but recurring aspect in disability appeals brought to this Court is that arguments raised here often were not raised during the administrative hearing even though they could have been raised there. This is true in this case as well. Plaintiff's counsel submitted a three-page pre-hearing brief to the ALJ; participated in the administrative hearing; and then submitted a two-page brief to the Appeals Council. . . . The Government has not argued that these arguments have been waived, and the Court is not aware of grounds for making such an argument. But the Court continues to believe that a waiver doctrine would be both fair and efficient by encouraging counsel to raise these issues during the administrative proceedings. Even if there is no formal waiver doctrine, as a practical matter, counsel's failure to raise arguments in the administrative proceedings raises a question about how significant the alleged errors were. And it also raises concerns about sandbagging. For these reasons, on remand in this case, as well as in future cases, the Court strongly encourages plaintiff's counsel to explicitly and contemporaneously raise any perceived errors so that the ALJ (or Appeals Council) is given the opportunity to address them.

*James E. v. Berryhill*, 357 F. Supp. 3d 700, 703 (N.D. Ill. 2019). We could not agree more.

Beyond that, the plaintiff has some issues with the ALJ's consideration of his daily activities. The ALJ mentioned – twice -- that plaintiff was "independent in bathing, dressing and in activities of daily living, including driving, shopping, using the telephone, food prep,

housekeeping, laundry, taking medication and finances," and thought those activities were "inconsistent with [plaintiff's] alleged extreme functional limitations . . . ." (R. 27). The plaintiff, on the other hand, takes the ALJ to task for not explaining how they are inconsistent with plaintiff's alleged limitations. [Dkt. #16, at 14; #21, at 7]. While the court might tend to agree that plaintiff's activities were so minimal that some explanation was required, that is not enough to overturn the ALJ's assessment of his complaints given the foregoing discussion.

A court can only overturn an ALJ's credibility finding if the plaintiff can show it was patently wrong. *Hohman*, 72 F.4th at 251; *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). That's a "high threshold." *Turner v. Astrue*, 390 Fed.Appx. 581, 587 (7th Cir. 2010); *see also Milliken v. Astrue*, 397 Fed.Appx. 218, 225 (7th Cir. 2010)(describing the burden as "heavy."). Indeed, the Seventh Circuit has described it as a greater burden than showing a decision is not support by substantial evidence. *Hohman*, 72 F.4th at 251. It is met only when ALJ's determination "lacks any explanation or support." *Murphy, supra*; *Elder*, 529 F.3d at 413–14; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). That's not the case here as the ALJ did provide valid reasons for doubting the plaintiff's allegations. It does not matter if one reason – or even more -- among them can be found to lacking. *See, e,.g. Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012)("Despite these shortcomings, the ALJ adequately evaluated [plaintiff's] credibility, and we see no reason to reverse."); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)(upholding the ALJ's credibility determination despite finding it "was not without fault" and seeing "some merit in two out of three of [plaintiff's] attacks . . . ."). In the end, the problem here was not the ALJ's assessment of the plaintiff's allegations; it was only the gaps in the ALJ's logical bridge from a marked impairment in social functioning to his RFC finding.

24

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #19] is denied and this matter is remanded to the Commissioner for further proceedings.

**ENTERED:** _____
                    **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 10/31/23